FILED
IN OPEN COURT
OCT 28 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN ALLEN KURRLE,<br><br>Defendant. | No. 1:26-cr-198 |

## STATEMENT OF FACTS

The United States and the defendant, JOHN ALLEN KURRLE, stipulate that the allegations in the Criminal Information and the following facts are true and correct. The United States and KURRLE further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

1. From at least in or around June 2025 to in or around October 2025, in the Eastern District of Virginia and elsewhere, KURRLE conspired with others, known and unknown, to devise a scheme and artifice to defraud and obtain property from employers by means of materially false and fraudulent pretenses, representations, and promises, and did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds.

2. KURRLE participated in a scheme to defraud U.S. companies, many of which were U.S. Government contractors, in which he allowed other individuals to use his identity to apply for remote work positions. In at least one case, KURRLE conspired to fraudulently use the identity of a third person, without that person's consent, to apply for such positions. KURRLE further agreed with coconspirators to receive laptops shipped by the victim companies to his

home in the Eastern District of Virginia and to enable individuals located outside the United States to remotely access the laptops. Ultimately, the wages obtained from U.S. companies through this fraudulent scheme would be funneled to the government of the Democratic People's Republic of Korea ("North Korea").

3. KURRLE does not dispute that the scheme likely benefitted North Korea, although he was unaware of the connections to North Korea during his involvement in the conspiracy.

4. At all relevant times described below, KURRLE resided in Gainesville, Virginia, in the Eastern District of Virginia.

5. From at least in or around June 2025 to on or about August 19, 2025, KURRLE was employed by a cleared defense contractor for the U.S. Government (the "Cleared Company"). While employed by the Cleared Company during this time, KURRLE held an active TOP SECRET security clearance with the U.S. Government.

**North Korean IT Worker Scheme**

6. Since 2003, North Korea has been under sanction by the United Nations due to, among other things, its nuclear weapons program. Since 2016, the United States has likewise had comprehensive trade and economic sanctions against North Korea, effectively cutting North Korea off from the U.S. marketplace and financial system and restricting the ability of U.S. persons and companies from doing business with North Korean institutions. As a result, North Korea has sponsored a variety of schemes to evade these sanctions and earn money for the regime. As part of one such scheme, North Korea has dispatched thousands of information technology ("IT") workers to obtain remote, pseudonymous employment with companies around the world. While some of these IT workers operate from cities inside North Korea, many

perform IT work from other countries outside the United States.

7. North Korean IT workers are aided in this fraud by persons residing in the United States. These U.S. facilitators receive and host laptop computers and other hardware issued by U.S. victim companies at the facilitators' residences in the United States. Using login credentials provided to them by the overseas IT workers—unbeknownst to and without authorization from the U.S. victim companies—the U.S. facilitators enable the IT workers to remotely access laptop computers, including by connecting the laptops to the Internet and downloading unauthorized remote-access software to the computers. By using the U.S. facilitators' Internet connections and the unauthorized remote-access software, the conspirators make it appear to U.S. victim companies that the overseas IT workers are performing their work from U.S. locations. The North Korean IT workers often use stolen U.S.-person identities to apply for positions with U.S. victim companies. Sometimes, the North Korean IT workers apply to positions using the identity of a U.S. facilitator with the facilitator's knowledge and assistance. In exchange for these and other services, many U.S. facilitators are paid a fee. Most of the money generated by this scheme, however, is funneled to the overseas IT workers and their overseas coconspirators for the benefit of North Korea.

**Company-1**

8. On or about August 12, 2025, an individual using KURRLE's identity applied for a remote work position with "Company-1," a U.S. Government contracting company based in California.

9. On or about August 19, 2025, after conducting a phone interview with the real

KURRLE, Company-1 offered "KURRLE"[1] a position as a software engineer to work on a generative artificial intelligence project for a component of the U.S. military, with a salary of $130,000 per year.

10. "KURRLE" accepted the offer, and Company-1 shipped a laptop to KURRLE's residence in the Eastern District of Virigina.

11. On or about September 3, 2025, Company-1 conducted a video call with "KURRLE" to verify his employment eligibility, using information he provided through a U.S. Citizenship and Immigration Services Form I-9. However, Company-1 noticed several discrepancies, including that the "KURRLE" who appeared on the video call did not appear to match the real KURRLE's age or physical characteristics.

12. Company-1 terminated the employment of "KURRLE" before he performed any work on the military contract, and the real KURRLE shipped the laptop back to Company-1.

13. On or about September 12, 2025, Company-1 mailed a check in the amount of $1,821.65 to "KURRLE," at KURRLE's residence, for approximately 32 hours of work related generally to the onboarding process. This amount was the net payment to "KURRLE" based on $2,192.50 in gross wages paid by Company-1.

**Company-2**

14. In or around August 2025, "Company-2," a U.S. Government contracting company based in the Eastern District of Virginia, contacted KURRLE through a website that facilitates the hiring of individuals who hold a U.S. Government security clearance. KURRLE's

---

[1] Because KURRLE allowed coconspirators to use his identity, this Statement of Facts places KURRLE's name in quotation marks when referring to instances in which another individual used KURRLE's identity. For example, "KURRLE" may refer to an IT worker who applied to a job using KURRLE's name. To avoid confusion, some instances also refer to the "real" KURRLE, reflecting that KURRLE himself took a particular action.

profile on the website indicated that he held a TOP SECRET clearance, which met one of Company-2's criteria for the position. The real KURRLE responded to Company-2's message through the website.

15. On or about August 19, 2025, Company-2 informed KURRLE that a successful applicant must possess an active TS/SCI security clearance.[2] That same day, KURRLE scheduled a screening interview with Company-2.

16. On or about September 8, 2025, Company-2 offered "KURRLE" a position as a senior software engineer with a salary of $170,000 per year.

17. KURRLE then received physical paperwork from Company-2 at his residence, which he completed and mailed back to Company-2.

18. On September 22, 2025, Company-2 conducted a video call with "KURRLE" as part of the pre-employment screening process, motivated in part by discrepancies between his reported work history and the results of Company-2's background investigation. The "KURRLE" who appeared on the video call was not the real KURRLE and appeared to be approximately 30 years younger than KURRLE. During the video call, "KURRLE" was unable to adequately explain the discrepancies.

19. On or about October 29, 2025, Company-2 terminated the employment of "KURRLE" before he performed any work for Company-2.

---

[2] An individual with a "TS/SCI" clearance is authorized to access information classified as TOP SECRET as well as "sensitive compartmented information." Information may be classified as TOP SECRET if its unauthorized disclosure "could reasonably be expected to cause exceptionally grave damage to the national security" of the United States. Executive Order 12356, § 1.1(a)(1). SCI is a type of special access program pertaining to intelligence sources, methods, or analytical processes, and it is created upon a finding that the vulnerability of, or threat to, specific information is exceptional, and the normal criteria for determining eligibility for access applicable to information classified at the same level (*e.g.*, TOP SECRET) are not sufficient to protect the information from unauthorized disclosure. *See id.* § 4.2.

**Company-3**

20. In addition to allowing coconspirators to use his own identity, KURRLE facilitated his coconspirators' use of a stolen U.S.-person identity ("John Doe") to fraudulently obtain employment with "Company-3," a specialized retailer with locations in Wisconsin.

21. On or about July 25, 2025, "John Doe" applied to a remote work position with Company-3.

22. On or about September 22, 2025, Company-3 offered "John Doe" a position as an IT enterprise architect with a salary of $125,000 per year.

23. "John Doe" told Company-3 that he had moved back to Gainesville, Virginia, specifically to KURRLE's address. Company-3 then shipped a laptop for "John Doe" to KURRLE's residence, which KURRLE received on or about October 2, 2025. KURRLE unpacked the laptop and connected it to his home Internet, after which a coconspirator provided KURRLE login credentials for the laptop and instructed KURRLE to log in.

24. Between on or about October 6, 2025, and on or about October 23, 2025, "John Doe" performed approximately 3 weeks of work for Company-3.

25. On or about October 23, 2025, the FBI notified Company-3 that "John Doe" was linked to fraudulent activity associated with an IT worker scheme. Company-3 performed an internal review and terminated "John Doe" on or about the same day.

26. In total, Company-3 paid $4,807.73 in gross wages ($4,192.66 in net wages) to "John Doe."

**Other Companies and Total Impact**

27. In total, between in or around July 2025 and in or around September 2025, KURRLE submitted, facilitated the submission of, or assisted with employment resulting from at

least 88 job applications to U.S. companies.

28. These applications, which used KURRLE's identity or a stolen U.S.-person identity, resulted in expressions of interest from at least 10 companies. At least 9 companies were fraudulently induced to extend a job offer to KURRLE's coconspirators, including Company-1, Company-2, and Company-3. The 9 positions for which KURRLE's coconspirators received job offers had a salary range of $120,000 to $190,000 per year.

29. The salary for each offer is reflected below, along with the time that elapsed from the date of KURRLE's initial application or interview to October 20, 2025, when the FBI interviewed KURRLE and searched his residence. The prorated salary for each position, based on the time between initial application/interview and the FBI's interview and search, is also reflected below.

| **Company Extending Offer** | **Days from Application / Interview to Search 10/20/25** | **Salary Offered** | **Prorated Salary** |
|---|---|---|---|
| **Company 1** | 69 | $ 130,000 | $ 24,575.34 |
| **Company 2** | 62 | $ 170,000 | $ 28,876.71 |
| **Company 3** | 87 | $ 125,000 | $ 29,794.52 |
| **Company 4** | 34 | $ 130,000 | $ 12,109.59 |
| **Company 5** | 47 | $ 190,008 | $ 24,466.78 |
| **Company 6** | 75 | $ 133,350 | $ 27,400.68 |
| **Company 7** | 91 | $ 120,000 | $ 29,917.81 |
| **Company 8** | 67 | $ 130,000 | $ 23,863.01 |
| **Company 9** | 30 | $ 124,800 | $ 10,257.53 |
| **TOTAL** | | | **$ 211,261.99** |

30. This Statement of Facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact

known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

23. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

By: ______________________________
Jonathan S. Keim
Assistant United States Attorney
Eastern District of Virginia

John A. Eisenberg
Assistant Attorney General
National Security Division

By: /s/
Matthew A. Anzaldi
Deputy Chief
National Security Cyber Section
National Security Division

**Defendant's signature:** After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, John Allen Kurrle, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 10-28-26

John Allen Kurrle
Defendant

**Defense counsel signature:** I am John Allen Kurrle's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 10-28-26

Nathaniel Wenstrup
Counsel for the Defendant